## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE | : | |
| Plaintiff | : | No.  2:24-cv-00051-WSS |
| | : | |
| v. | : | |
| | : | |
| PINE-RICHLAND SCHOOL DISTRICT | : | |
| | : | |
| Defendant | : | |

### MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, plaintiff, Jane Doe, respectfully moves for a preliminary injunction barring defendant, or anyone acting through or on behalf of defendant, from enforcing Section C, D, E, F, G, or H of Pine-Richland School District Administrative Regulation 103(B). Plaintiff relies upon its accompanying memorandum of law and declaration from plaintiff. A form of proposed order is also attached.

Respectfully submitted,
/s/Walter S. Zimolong
Dated:  February 2, 2024      Walter S. Zimolong, III, Esquire
Attorney I.D.: PA 89151
James J. Fitzpatrick, III, Esquire
ZIMOLONG LLC
wally@zimolonglaw.com
james@zimolonglaw.com
P. O. Box 552
Villanova, PA 19085
(215) 665-0842


/s/ Nicholas R. Barry*
Nicholas R. Barry
America First Legal Foundation

Tennessee Bar No. 031963
nicholas.barry@aflegal.org
611 Pennsylvania Ave SE #231
Washington, DC 20003
*pro hac vice admission pending

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | No.  2:24-cv-00051-WSS |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| PINE-RICHLAND SCHOOL DISTRICT | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

This case involves Pine-Richland School District (the "School District") Administrative Regulation 103(B) ("AR 103(B)"). AR 103(B) applies to "gender incongruent" or "transgender" children in the School District of any age. "Gender incongruent" or "transgender" refers to a child whose psychological sense of gender differs from their biological sex. If a child exhibits signs of gender incongruity, AR 103(B) requires that all School District personnel keep it a secret from parents, unless ordered by a Court or where the child gives consent. More nefariously, AR 103(B) requires a gender incongruent child to meet with a "Student Support Team" – comprised of the school's principal, guidance counselor, nurse, and psychologist – who will develop a timeline for the gender incongruent child to "transition" his or her gender. Transitioning refers to a process whereby a gender-incongruent child's gender identity is encouraged or affirmed. The process includes social affirmation by using a child's "preferred" name or pronouns, the use of hormone treatments, such as puberty-blocking drugs, or

medical alteration of the body. The "Student Support Team" excludes a child's parents and parents do not need to give parental consent to the transitioning plan.

AR 103(B) is unconstitutional. It violates the deeply rooted due process rights of a parent to maintain the care, custody, and control of a child without undue state interference, which includes making health care decisions for a child, such as what care and treatment a gender incongruent child should receive. It violates a century of precedent declaring that a parent's role in a child's life is primary. And it violates clear precedent that school policies shall yield to the rights of a parent, except where there is a compelling state interest. Moreover, AR 103(B) is contrary to the near-unanimous medical consensus that a parent should always be involved in the treatment plan for a gender-incongruent child.

Doe is a parent of a child in the School District who has shown signs of gender incongruity. Doe requested that the School District notify her of any indications that her child is experiencing gender incongruence. She also forbade the School District from providing her child with care from the Student Support Team or any mental health professional from the School District. But the School District has flatly rejected Doe's requests. To the contrary, the School District has told Doe she has no parental rights under AR 103(B) and that it would follow the provisions of AR103(B) concerning her child. AR 103(B) violates Doe's Fourteenth Amendment Due process rights. Therefore, Doe moves for a preliminary injunction to abate an irreparable harm that the School District is imposing on her through AR 103(B). Doe has a probability of winning on the merits, the balance of equities favors Doe, and the public

interest favors an injunction. Accordingly, the Court should issue a preliminary injunction.

## I.    BACKGROUND

### A. GENDER INCONGRUENT OR TRANSGENDER PERSONS.

A "gender incongruent" person (also known as a "transgender" person or "gender nonconforming" person) "refers to a person whose sex [recognized] at birth (i.e. the sex [recognized] at birth, usually based on external genitalia) does not align to their gender identity (i.e., one's psychological sense of their gender)."[1] If a gender incongruent person does not receive proper treatment he or she may experience "gender dysphoria." Gender dysphoria "refers to psychological distress that results from an incongruence between one's sex [recognized] at birth and one's gender identity."[2] A clinical diagnosis is required to determine if a gender incongruent person has gender dysphoria.[3]

Most gender incongruent children simply "grow out" of the condition. That is at a certain age they no longer identify with a gender different than their biological sex.[4] Gender-incongruent children should receive treatment from a mental health

---

[1] American Psychiatric Association, *What is Gender Dysphoria?*, https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria (Last visited, Jan. 19, 2024).

[2] *Id.*

[3] *Id.*

[4] Am. Psychol. Ass'n, Guidelines for Psychological Practice with Transgender and Gender Nonconforming People, 70 Am. Psychologist 832, 842 (2015).

Multiple courts have found the APA guidelines authoritative on issues of gender incongruent child in public schools. *See e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), as amended (Aug. 28, 2020); *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019); *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118 (D. Md. 2022), vacated and remanded, 78 F.4th 622 (4th Cir. 2023)

professional experienced in treating gender-incongruent children. "Psychologists and other mental health professionals who have limited training and experience in [gender] affirming care may cause harm to [transgender] people."[5] There is no "adequate[], empirically validated, consensus . . . regarding the best practice [for treatment]."[6] And there is "limited available research regarding the potential benefits and risks of different treatment approaches for children and for adolescents."[7] Accordingly, mental health professionals take divergent views on the proper treatment protocol for gender-incongruent children.[8] One camp believes it is appropriate to assist gender-incongruent children "to socially transition and to begin medical transition when their bodies are physically developed."[9] The other camp believes that gender-incongruent children should be encouraged to embrace their biological sex because medical alteration of the body and living as a transgender adult "may cause harm or lead to psychosocial adversities."[10] Still, there is a near universal belief, even among those that favor "transitioning," that the child's treatment *should involve the child's parents*.[11]

## B. SCHOOL BOARD ADMINISTRATIVE REGULATION 103(B)

But the School District thinks it knows better. In 2017, it passed AR 103(B). A copy of AR 103(B) is attached at Exhibit 1 to the Complaint, ECF No. 1-1. AR 103(B)

---

[5] *Id.* at 832.
[6] *Id.* at 842.
[7] *Id.* at 843.
[8] *Id.* at 842.
[9] *Id.*
[10] *Id.*
[11] *Id.* ("Psychologists are encouraged to offer *parents* and guardians clear information about available treatment approaches, *regardless of the specific approach chosen by the psychologist*.") (emphasis added)

states that "[a]ll students" – regardless of age – "have a right to privacy and this right includes the right to keep one's transgender status private at school." *Id.* at § D. AR 103(B) states, "transgender and gender-expansive students have the right to discuss his or her gender identity openly and to decide when, with whom, and how much to share private information." *Id.* AR 103(B) states, "[t]o ensure the safety and well-being of the student, District personnel should not disclose a student's transgender status to others, **including the student's parents/guardians** or other District person-nel, unless: (1) legally required to do so, or (2) the student has authorized such dis-closure."[12] *Id.* (emphasis added). AR 103(B) states the child **shall meet** with a Student Support Team (the "Transition Team") to "discuss a timeline for the transition in order to create the conditions supporting a safe and accepting environment at the school." *Id.* at § E. AR 103(B) states a "gender transition" is "[t]he processes by which some individuals strive to more closely align their gender identity with outward man-ifestations. Some people socially transition, whereby they might begin dressing, using names and pronouns and/or be socially recognized based on their gender identity. Others undergo **physical transitions** in which they modify their bodies through med-ical interventions. *Id.* at § C (emphasis added). AR103(B) goes on to state "surgical treatments are **generally** not available for school age transgender youth." *Id.* (empha-sis added).

---

[12] AR 103(B) ban on parental disclosure applies only to a child's "transgender status." It does not apply to a child expressing issues with his or her sexuality, sexual practices, or a child exhibiting signs of depression. Thus, under AR 103(B), School District employee could not disclose to a parent that a child is transgender but could disclose to a parent that the child is gay or lesbian.

The Transition Team consists of the school nurse, psychologist, principal, guidance counselor, and the child's teacher. *Id.* at § C. But it does not include a student's parent. *Id.* In fact, AR 103(B) does not require any parental notification that a student is meeting with a Transition Team. *Id.* Meanwhile, the Transition Team will help the student transition at school without parental notice or consent. "When a student transitions during the school year, the [Transition Team] shall hold a meeting with the student and parents/guardians, **if they are involved in the process**. The Student Support Team should discuss a timeline for the transition in order to create the conditions supporting a safe and accepting environment at the school." *Id.* at § E. There is nothing in AR103(b) that would prevent this "transition" from including physical transitions, including medications. And parents may not even be involved in the process.

Thus, despite this near universal belief that (a) parents should be involved in the treatment of a gender-incongruent child and (b) treatment come from mental health professionals with extensive experience in treating gender incongruity, the School District has enacted AR 103(B), which excludes parents from the treatment of gender incongruent children in the School District and places the care of these children, not in the hands of a trained mental health professional with extensive experience in the treatment of a gender-incongruent child, but in the hands of the school nurse, psychologist, and guidance counselor.

## C.  JANE DOE

Doe is a parent of a child in the school district. Declaration of Jane Doe ("Doe Decl."), ¶ 1. Doe has legitimate concerns that her child is gender incongruous. *Id.*, ¶

2. Doe found her child viewing online videos related to transitioning, videos of transgender individuals advocating transitioning, and videos on sexuality. *Id.*, ¶ 3. Doe's child has recently begun hanging out with a new friend group, which includes children who identify as transgender or who are socially transitioning. *Id.*, ¶ 4. Doe is concerned that if her child does begin exhibiting more pronounced signs of gender incongruity at school or gender dysphoria, the School District will immediately begin providing her child gender-affirming care from inexperienced and untrained personnel before Doe knows and can take steps to help her child obtain appropriate medical treatment. *Id.*, ¶ 5.

Doe sent written notice to the School District that, absent her prior written consent, the School District shall not refer her child to any mental health counselor or social worker for evaluation. *Id.*, ¶ 6. Doe's notice to the School District also demanded that the School District notify her within three days of learning about any matters related to gender identity or gender dysphoria expressed by her child. *Id.*, ¶ 7. Doe met the principal of her child's school and the school's guidance counselor, to discuss her written notice. *Id.*, ¶ 8. At the meeting, School District representatives told Doe that, pursuant to AR 103(B), under no circumstances would the School District notify her if it becomes aware that her child has requested to be addressed by different pronouns, a different name, or otherwise exhibited behavior consistent with gender incongruity, gender dysphoria, or a desire to transition to a gender other than her biological gender. *Id.*, ¶ 9. The School District's representatives further stated to Doe that they would only notify her if "legally required to do so." *Id.*, ¶ 10. Finally,

the School District's representatives stated to Doe that she had no parental rights under AR 103(B). *Id.*, ¶ 11.

Thereafter, Doe emailed the School District memorializing what was stated to her at the meeting, including the statements made concerning parental rights under AR 103(B). *Id.*, ¶ 12. She stated that the School District should immediately notify her if she had misstated the School District's positions concerning AR 103(B) that the School District expressed at the meeting. *Id.*, ¶ 13. The School District responded to Doe's email. *Id.*, ¶ 14. The School District did not deny that it stated that Doe had no parental rights under AR 103(B). *Id.*, ¶ 15. Regarding AR 103(B), the School District stated the School District was a "partner" with parents and, therefore, would not comply with Doe's demand to be notified if the School District becomes aware that her child has requested to be addressed by different pronouns, a different name, or other exhibited behavior consistent with gender dysphoria or a desire to transition to a gender other than her biological gender. *Id.*, ¶ 16. Rather, the School District stated it would work with the student, not the parent, on such matters. *Id.*, ¶ 17.

Doe now moves for a preliminary injunction.

## II. ARGUMENT

### A. THE STANDARD FOR OBTAINING A PRELIMINARY INJUNCTION.

In the Third Circuit, there are four factors Doe must show to obtain a preliminary injunction. Doe must show (1) she will suffer irreparable harm absent injunctive relief, (2) "that [she] *can* win on the merits," (3) the balance of the equities favors her, and (4) the public interest is served by the preliminary injunction. *Reilly v. City of*

*Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), as amended (June 26, 2017). A district court "balances these four factors to determine if an injunction should issue." *BP Chemicals Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000). "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Reilly*, 858 F.3d at 179 (quoting *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). Doe shows all four factors, and, on balance, those factors favor a preliminary injunction.

### 1. A VIOLATION OF DOE'S FOURTEENTH AMENDMENT RIGHTS IS IRREPARABLE HARM.

"Federal courts have long held that that the deprivation of constitutional right [is] irreparable." *Cty. of Butler v. Wolf*, 2020 WL 2769105, at *5, n. 3 (W.D. Pa. May 28, 2020). The School District can hardly dispute that Doe has "the fundamental right [] to make decisions concerning the care, custody, and control of [her] child[]" *Troxel v. Granville*, 530 U.S. 57, 65 (2000), that is free from "undue state interference." *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000). More than a century of case law has repeatedly proclaimed this. *See e.g., Meyer v. Nebraska*, 262 U.S. 390, 399 (the Fourteenth Amendment protects the right to "marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in

the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.") *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 554, 54 L. Ed. 2d 511 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *Troxel*, 530 U.S. at 65 (the right "is perhaps the oldest of the fundamental liberty interests recognized by this Court.") *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 261 (3d Cir. 2007) ("The Supreme Court has long recognized that the right of parents to care for and guide their children is a protected fundamental liberty interest."); *Gruenke v. Seip*, 225 F.3d 290, 303 (3d Cir. 2000) ("The right of parents to raise their children without undue state interference is well established.") The Supreme Court has declared that the rights of parents are "essential," "basic civil rights of man" and "far more precious ... than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Accordingly, parental rights concerning matters of "family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–640, (1974).

A parent's right to care for a child includes a "dominant" right to make health care decisions on behalf of a child. *Parham v. J. R.*, 442 U.S. 584, 604 (1979) "Most children, even in adolescence, simply are not able to make sound judgments

concerning many decisions, including their need for medical care or treatment. [Therefore], parents can and must make those judgments" *Id. at* 603. This includes medical treatment with which the child might disagree. *Id.* at 604. ("The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child.") *Parham* illustrates the breadth of parental right to control the health care of a child.

There, the Supreme Court, held that a Georgia state statute that allowed a parent to commit a child to a mental hospital did not violate the child's due process rights. The plaintiffs were a class of children being treated in a Georgia state mental hospital. *Id.* at 588. They claimed that Georgia's voluntary commitment procedures for children violated his due process rights under the Fourteenth Amendment. *Id.* Under those procedures, which were dramatic even by standards of the time, a parent or guardian could apply for a child to be committed to a state mental hospital. *Id.* at 591. The hospital would evaluate the child and, if it found "evidence of mental illness" that could be treated, commit the child "for such period and under such conditions as may be authorized by law." *Id.*

The district court ruled in favor of the plaintiff class and enjoined the Georgia statute. The district court held that the statute deprived children of the liberty interest of being free from "bodily restraint" and "emotional and psychic harm." *Id.* at 597. Accordingly, it held children must be afforded the right to notice and an opportunity

to be heard before they can be confined to a mental hospital by their parents. *Id.* The Supreme Court disagreed.

The Court acknowledged that while a child might have a liberty interest in "not being confined unnecessarily for medical treatment" *Id.* at 600, that right did not overcome the rights of a parent to determine the proper care for their child. *Id.* at 601-602. In so holding, the Court relied upon its precedent, including *Yoder* and *Pierce*, that "reflected Western civilization concepts of the family as a unit with *broad parental authority over minor children.*" The Court expressly rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations." *Id.* at 602 (citations omitted). The Court further held that a parent's right "includes a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id.* The Court then explains how far parental authority goes.

First, the Court tersely rejected an argument that parental authority is diluted because some parents might be bad actors and, therefore, might not act in the best interests of their children holding "[t]he statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition." *Id.* at 603.

Second, the Court dispelled any notion that a child had a say in his medical care holding "simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that

12

decision from the parents to some agency or officer of the state" and "the fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child." *Id.* at 603-604.

Thus, *Parham* makes clear that Doe maintains a dominant role in making mental health care decisions on behalf of her child, Doe's child's fear that her mother may decide on a treatment objectionable to her does not diminish Doe's dominance, and the School District cannot dispense with Doe's parental rights because some parents may not act in a child's best interest. In fact, the Court presumes fit parents act in the best interest of their children, and there has been no finding that Doe is anything but a fit parent. *Troxel*, 530 U.S. at 69–70.

Parental rights also do not end at "the threshold of the school door." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005). "Public schools must not forget that '*in loco parentis*' does not mean 'displace parents.'" *Gruenke*, 225 F.3d at 307. In *Gruenke*, the Third Circuit articulated parental rights in the public-school setting.

In *Gruenke*, a high school swim team coach suspected that a student was pregnant. *Gruenke*, 225 F.3d at 295. But he kept his suspicions secret from the student's parents. *Id.* at 306. Instead, he discussed his suspicions with other coaches, guidance counselors, and teammates. *Id.* at 305. The swim coach also asked the student if she was pregnant and attempted to discuss with her sex and pregnancy. *Id.* at 297. At the request of the swim coach, the school nurse and guidance counselor also

approached the student to discuss her suspected pregnancy. *Id.* The coach then gave the student's friends a pregnancy test and suggested that the student take it. *Id.*

The student's parents sued the School District claiming, among other things, a violation of their parental rights. The district court held that the swim coach had not violated the plaintiff's parental right to "influence and guide her daughter during pregnancy" and that, in all events, the coach was entitled to qualified immunity. *Id.* at 303. The Third Circuit disagreed with the district court's holding that Mrs. Gruenke's parental rights were not violated. (However, it did agree that the swim coach was entitled to qualified immunity.)

The Third Circuit began by reiterating that "the rights of parents to raise their children without undue state interference is well established." *Id.* The Court did acknowledge that parental authority is not limitless, particularly when a child is in school, and "it is not unforeseeable . . . that a school's policies might come into conflict with the fundamental right of parents to raise and nature their child." *Id.* at 305. However, the Court was clear that "when such collisions occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Id.* The Court went on to explain that "it is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights." *Id.* at 307.

The *Gruenke* Court also made two pertinent pronouncements. First, it held that "we have considerable doubt about [the] right of [school officials] to withhold

[medical] information [] from the parents." *Id.* Second, it held "school-sponsored coun-seling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution." *Id.*

In sum, the School District's edict that Doe has no parental rights under AR 103(B) is flatly wrong. Doe clearly has a constitutionally protected right guaranteed by the due process clause of the Fourteenth Amendment in the care, custody, and control of her child. This right includes making important mental health care deci-sions on behalf of her child. Accordingly, Doe easily satisfies the irreparable harm element necessary to obtain a preliminary injunction.

### 2. DOE HAS A REASONABLY LIKELIHOOD OF SUCCESS ON THE MERITS.

Doe also shows that there is a reasonable likelihood that she will succeed on her claim that AR 103(B) violates her parental rights under the Fourteenth Amend-ment. To satisfy the "likelihood of success on the merits" prong on the preliminary injunction standard, Doe need only show that she "*can* win on the merits." *Reilly*, 858 F.3d at 179 (emphasis added). This requires her to merely show a "significantly better than negligible but not necessarily more likely than not" chance of success. *Id.* Given the long line of Supreme Court pronouncements on the deeply rooted rights of parents and Third Circuit precedent regarding the dominance of these rights when they con-flict with school policies, Doe certainly has a "better than negligible" chance of proving on the merits that AR 103(B) plainly interferes with her Fourteenth Amendment pa-rental rights. Doe can demonstrate this in many ways.

First, AR 103(B)'s secrecy requirements are constitutionally suspect. AR 103(B) states that "district personnel should not disclose a student's transgender status to others, including the student's parents/guardians." AR 103(B) further states that "notifying a student's parent/guardian about his or her gender identity may be unnecessary." But, under *Gruenke*, there is "considerable doubt" about the constitutionality of these secrecy provisions. *Gruenke*, 225 F.3d at 305. Children do not have privacy rights as against their parents. Every parent understands this.

Second, AR 103(B) displaces the supreme role of Doe in her child's life. It does this by requiring the School District to defer to a child regarding whether their gender identity should be disclosed to a parent. AR 103(B) at § D ("District personnel should not disclose a student's transgender status to others, including the student's parents/guardians, . . .unless . . . the student has authorized such disclosure.") It does this by deferring to a child whether a parent will be involved in the child's gender transition and meeting with the School District's Transition Team. *Id*., § E ("Prior to notification of any parent/guardian regarding the transition process, District staff must work closely with the student to assess the degree to which, if any, the par-ent/guardian will be involved in the process.") It does this by requiring the School District to refer to Doe's child by *Doe's child's* preferred pronouns and preferred name. One of the first primary acts of a parent is giving a newborn child a name. AR 103(B) at § G. It tells School District officials to ignore this primary act. Thus, AR 103(B) wholly displaces this fundamental primary role of a parent and supplants it with the

desires of the child. But AR 103(B) cannot be squared with *Gruenke's* clear pronouncement that "the *primacy* of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Gruenke*, 225 F.3d at 305.

Third, AR 103(B) interferes with Doe's right to control the medical care of her child. Doe cannot exercise her right to make health care decisions for her child if the School District keeps her condition secret from her. Worse, Doe's right to make health care decisions for her child is displaced altogether, if the School District provides secret gender-affirming care through the Transition Team. AR 103(B) requires the Transition Team to "discuss a timeline for the [child's] transition and to create conditions that "support[] a safe and accepting environment at the school." These provisions defy *Parham* and *Gruenke*. Doe's right to make health care decisions on her child's behalf is dominate to her child's desires to socially transition and be called by a different name, different pronoun, or to transition into a different gender.

Fourth, AR 103(B) drives a wedge between Doe and her child. "The Court has frequently emphasized the importance of the family," and special bond between parent and child explaining: "It is the interest of the parent in the "companionship, care, custody and management of his or her children and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association." *Stanley*, 405 U.S. at 651. AR 103(B) breaks the "quintessential personal bonds" that act as "a critical buffer between the individual and the power of the State." *Gruenke*, 225 F.3d at 305 (quoting *Robets v. United States Jaycees*, 468 U.S.

609, 619-620 (1984)). It expresses a school district-child relationship that is paramount to the parent-child relationship.

The School District ignores these constitutional infirmities because it believes parents have no rights and it is a "partner" with parents. These positions are categorically false. A parent's role in a child's life is "primary. . .beyond debate" *Yoder*, 406 U.S. at 232, "dominant," *Parham*, 442 U.S. at 585, and "fundamental." *Troxel*, 530 U.S. at 65. The School District plays only a secondary role in a child's life, yielding to the "primacy of the parent's authority." *Gruenke*, 225 F.3d at 305, 307.

Accordingly, Doe shows that she has a reasonable probability of success on the merits and satisfies the second element needed to obtain a preliminary injunction.

### 3. THE BALANCE OF HARMS FAVORS DOE.

Doe has shown the two "gateway factors" needed for a preliminary injunction. Therefore, the Court should consider the remaining two factors—the balance of the harms and the public interest—before deciding to grant injunctive relief. Both remaining factors fall decidedly in favor of Doe.

The balance of the harms clearly favors Doe. AR 103(B) clearly violates Doe's Fourteenth Amendment rights. But AR 103(B) also harm's Doe's child. AR 103(B) disregards warnings that "[p]sychologists and other mental health professionals who have limited training and experience in TGNC-affirmative care *may cause harm to [transgender] people.*" 70 Am. Psychologist 832. The school nurse, principal, and guidance counselor are no more qualified to render complex mental health treatment to children with gender incongruity than they are in providing pediatric oncology care.

18

It ignores that there is no "one size fits all" treatment approach for gender-incongruent children and recognizes a divergence of views on treatment with "limited available research regarding the potential benefits and risks of different treatment approaches for children and for adolescents." 70 Am. Psychologist at 843. It pays no attention to the near-universal belief that a parent, even a parent opposing a transition, should be involved a gender-incongruent child's care.

On the other hand, the School District would not be harmed at all. The School District is not obligated to keep a child's transgender status secret from a parent. Just the opposite, parental rights compel the School District to disclose a child's transgender status to a parent. *Gruenke*, 225 F.3d at 307. The School District is plainly wrong to suggest that a child has a generalized "right to privacy" that mandates the School District keep the child's status secret from a parent. Children have never enjoyed a broad constitutional right to keep information private from their parents. *See e.g. Planned Parenthood of Se. Pennsylvania v. Ca*sey, 505 U.S. 833, 899–900 (1992) (upholding the constitutionality of a Pennsylvania state statute requiring informed parental consent before a minor could obtain an abortion because, in part, it allowed parents to discuss with the minor "the consequences of her decision in the context of the values and moral or religious principles of their family."); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022) (rejecting any general right to "privacy" not deeply rooted in our constitutional traditions.)

The School District is likewise incorrect when it states that keeping a child's transgender status secret from parents is required under the Family Educational

Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g. But FERPA explicitly *requires* that the School District disclose information to parents, not keep it secret, and further requires parental, not student, consent before disclosing information to third parties. 20 U.S.C. § 1232g(b)(1)(H); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002) ("Congress enacted FERPA to assure *parents of students* ... access to their educational records.")

The School District is not obligated to provide treatment to gender-incongruent students. Moreover, that some parents might not act in the best interest of their gender-incongruent child does not tip the scales towards the School District. *Parham*, 442 U.S. at 603. ("The statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition.")

Accordingly, the balance of harms favors Doe.

### 4. The public interest favors an injunction.

As to the final factor, this is a textbook case of a preliminary injunction furthering the public interest. A preliminary injunction will prohibit the School District from engaging in a widespread civil rights violation. It will also prohibit the School District from providing unproven mental health treatment to children without the permission or involvement of parents. In any other similar situation, the Court would not hesitate to issue a preliminary injunction because it furthered the public interest. For example, if the School District enacted a regulation requiring the school nurse to perform compulsory tooth extractions on children with cavities, without parental

notification or permission, the Court would not hesitate to enjoin the practice. The Court would also not hesitate to act if the School District adopted a policy of dispensing methadone to a child with an opioid addiction at the request of the child and without parental consent.[13] Accordingly, the public interest consideration further tip the scales in favor of a preliminary injunction.

## CONCLUSION

Based on the foregoing, Doe respectfully requests that the Court grant a preliminary injunction against the School District prohibiting it, or anyone acting with or through it, from enforcing Section C, D, E, F, G, or H of AR 103(B).

Respectfully submitted,

Dated:  February 2, 2024

*/s/Walter S. Zimolong*
Walter S. Zimolong, III, Esquire
Attorney I.D.: PA 89151
James J. Fitzpatrick, III, Esquire
ZIMOLONG LLC
wally@zimolonglaw.com
james@zimolonglaw.com
P. O. Box 552
Villanova, PA 19085
(215) 665-0842

*/s/ Nicholas R. Barry*\*
Nicholas R. Barry
America First Legal Foundation
Tennessee Bar No. 031963
nicholas.barry@aflegal.org
611 Pennsylvania Ave SE #231
Washington, DC 20003

---

[13] Remarkably, while not requiring parental consent to administer transition care, the School District requires parental consent before a student can carry non-medicated cough drops to school and for the School District can administer over-the-counter medication to a child. https://www.pinerichland.org/Page/8614

\**pro hac vice admission pending*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JANE DOE                                    :
                                            :
                    Plaintiff               :     No.  2:24-cv-00051-WSS
                                            :
v.                                          :
                                            :
PINE-RICHLAND SCHOOL DISTRICT               :
                                            :     **JURY TRIAL DEMANDED**
                    Defendant               :

### Certificate of Service

I hereby certify the foregoing has been filed electronically and is available for viewing and downloading from the Electronic Case Filing System of the United States District Court for the Western District of Pennsylvania.

I further hereby certify that, in accordance with Fed. R. Civ. P. 5, service has been made upon counsel of record via ECF.

I further certify that I sent a copy of the foregoing via email to counsel for defendants as follows:

Jaime N. Doherty, Esquire
GRB Law
525 William Penn Place, Suite 3110
Pittsburgh, PA 15219

Date:  February 2, 2024                    */s/ Walter S. Zimolong, Esquire*