IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE,<br><br>                *Plaintiff*,<br><br>    v.<br><br>PINE-RICHLAND SCHOOL DISTRICT,<br><br>                *Defendant*. | Civil Action No. 2:24-cv-51<br><br>Hon. William S. Stickman IV |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

The Constitution does not give federal courts the authority to decide issues, no matter how timely and important. Article III of the Constitution confers upon the courts of the United States only the authority to decide cases and controversies. U.S. Const. Art. III. Plaintiff Jane Doe ("Doe"), a parent of a child enrolled in Defendant Pine-Township School District (the "District"), filed this action challenging the District's policy governing gender and gender identity, Administrative Regulation 103(B) ("AR 103(B)"). (ECF Nos. 1 and 31). She filed a Motion for a Preliminary Injunction asking the Court to enjoin the enforcement of the policy. (ECF No. 5). Because Doe has not demonstrated that she has suffered any harm or that harm is imminent, the Court finds that she does not have standing to challenge the District's policy. The Court must, therefore, deny the requested preliminary injunction.

      **I.**    **STANDARD OF REVIEW**

The grant or denial of a preliminary injunction is within the sound discretion of a district court. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 178–79 (3d Cir. 2017) ("District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their

1

sound discretion.'" (citation omitted)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). The "status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Rather, such relief "should be granted only in limited circumstances." *Kos Pharms.*, 369 F.3d at 708 (citation omitted). A moving party "must establish entitlement to relief by clear evidence." *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018). Specifically, the movant must demonstrate:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharms.*, 369 F.3d at 708; *see also Winter*, 555 U.S. at 20. The first two factors are "the most critical," and the moving party bears the burden of making the requisite showings. *Reilly*, 858 F.3d at 176, 179 (citations omitted). Once those "gateway factors" are met, a court should "consider[] the remaining two factors" and then "determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

In reaching its decision on a request for injunctive relief, a district court sits as both the trier of fact and the arbiter of legal disputes. A court must, therefore, make "findings of fact and conclusions of law upon the granting or refusing of a preliminary injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1178 (3d Cir. 1990) (citing Fed. R. Civ. P. 52(a)(2)). This "mandatory" requirement of Federal Rule of Civil Procedure Rule 52(a)(2) must be met "even when there has been no evidentiary hearing on the motion." *Id.* Nevertheless, at the

preliminary injunction stage, "procedures [] are less formal and evidence [] is less complete than in a trial on the merits." *Kos Pharms.*, 369 F.3d at 718; *see also AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) ("[T]he grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing [that] is the responsibility of the district judge." (citations omitted)). Accordingly, a court "may rely on affidavits and hearsay materials which would not be admissible evidence." *Kos Pharms.*, 369 F.3d at 718 (quoting in parenthetical *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). But the weight given to such materials will "vary greatly depending on the facts and circumstances of a given case." *Id.* at 719. A court is also tasked with assessing the credibility of witness testimony and may base the decision to grant or deny a preliminary injunction on credibility determinations. *See, e.g.*, *Hudson Glob. Res. Holdings, Inc. v. Hill*, No. 02:07CV0132, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007).

## II. PROCEDURAL AND FACTUAL BACKGROUND

Doe initiated this case by filing a complaint on January 12, 2024. (ECF No. 1). On February 2, 2024, she filed a Motion for a Preliminary Injunction. (ECF No. 5). On April 12, 2024, after briefing concluded on the motion, Doe filed an amended complaint ("Amended Complaint"). (ECF No. 31). The Court's review of the allegations in the Amended Complaint lead it to conclude that no changes were made relevant to the disposition of Doe's motion. At an April 8, 2024 status conference, the Court gave the parties the opportunity to have an evidentiary hearing to develop the record since it can look beyond the pleadings when deciding a preliminary injunction motion. Doe and the District declined. The parties elected to proceed on the facts set forth in the Amended Complaint and the declarations attached to their pleadings. (ECF No. 30).

3

Doe alleges that she is the parent of a student in the District. (ECF No. 31, p. 1). She challenges AR 103(B), specifically as to the areas where that policy interacts with parental rights. AR 103(B) is titled: "Nondiscrimination in School and Classroom Practice-Gender and Gender Identity." (ECF No. 1-2, p. 1). AR 103(B) includes a "Privacy and Confidentiality" provision that states:

> All students have a right to privacy[,] and this right includes the right to keep one's transgender status private at school. Information about a student's transgender status, legal name, or birth-assigned sex may also constitute confidential protected health information. Disclosing this information to other students, *their parents/guardians*, or other third parties may violate privacy laws, such as the Family Educational Rights and Privacy Act (FERPA).
>
> Similar to all students, the District shall ensure that protected health information and education records relating to transgender and gender-expansive students shall be kept confidential in accordance with applicable state and federal privacy laws. Transgender and gender-expansive students have the right to discuss and express his or her gender identity openly and to decide when, with whom, and how much to share private information. The fact that a student chooses to disclose his or her transgender status to District staff or other students does not authorize District staff to re-disclose that information.
>
> To ensure the safety and well-being of the student, District personnel should not disclose a student's transgender status to others, *including the student's parents/guardians* or other District personnel, unless: (1) legally required to do so, or (2) the student has authorized such disclosure. Relevant school staff, such as the building principal, guidance counselor, and school psychologist, will work actively and immediately to discuss disclosure to parents/guardians given their legal rights and the importance of collaboration between the school staff, student, and parents/guardians. When contacting the parent or guardian of a transgender student, District staff should use the student's legal name and the pronoun corresponding to the student's birth-assigned sex unless the student, parent, or guardian has specified otherwise.

(*Id.* at 2) (emphasis added). The provisions of AR 103(B) relating to "Student Transitions" also addresses the District's policy toward providing gender-related information to parents:

> In most cases, for a transgender student, beginning the process to live openly in a manner consistent with their gender identity is a very private matter.

4

> Since parents/guardians are generally aware of their child's development, ***notifying a student's parent/guardian about his or her gender identity or transition may be unnecessary***. In some cases, however, informing parents/guardians about a student disclosure carries risks for the student, such as physical and/or emotional abuse, abandonment, and/or removal from the home.
>
> ***Prior to notification of any parent/guardian regarding the transition process, District staff must work closely with the student to assess the degree to which, if any, the parent/guardian will be involved in the process and must consider the health, well[-]being, and safety of the transitioning student***. Upon notification by a student, parent/guardian, or representative that a student is undertaking, planning to undergo, or has completed a gender transition, the school will promptly inform the notifying individual and the student of the right to request a Student Support Team, consisting of appropriate school staff (e.g., building principal, guidance counselor, nurse, school psychologist, and teacher(s) as appropriate).
>
> When a student transitions during the school year, the Student Support Team shall hold a meeting with the student and parents/guardians, ***if they are involved in the process***. The Student Support Team should discuss a timeline for the transition in order to create the conditions supporting a safe and accepting environment at the school. The District staff will not require proof of medical treatments as [a]prerequisite for respecting the student's gender identity. If any objective basis should occur that would justify questioning whether a student's asserted gender identity is genuine, information may be requested to show that the gender identity is sincerely held.

(*Id.*) (emphasis added). Doe also takes issue with provisions of AR 103(B) governing the use of preferred names and pronouns:

> Every student has the right to be addressed by a name and pronoun that corresponds to the student's gender identity. A court-ordered name or gender change is not required, and the student need not change his or her official records. ***The building principal or a staff member designee should privately ask transgender or gender-expansive students at the beginning of the school year how they want to be addressed in class, in correspondence to the home, or at conferences with the student's parents/guardians***. In compliance with FERPA, the building principal will ensure that the preferred name and pronoun are communicated to staff members with a legitimate educational interest.

(*Id.* at 3) (emphasis added).

The facts supporting Doe's claims are set forth in her Amended Complaint and the largely duplicative allegations in her Declaration. (ECF Nos. 31 and 5-2). She pleads and avers

5

that she "has legitimate concerns regarding her child's risk of transitioning" because she "found her child viewing TikTok videos related to transitioning, videos of transgender individuals advocating transitioning, and videos on sexuality." (ECF No. 31, p. 6; ECF No. 5-2, p. 1). She also states that her child has "recently begun hanging out with a new friend group, which includes children who identify as transgender or who are socially transitioning." (*Id.*). Doe "sent written notice to the School District that absent her prior written consent, the School District shall not refer her child to any mental health counselor or social worker for evaluation" and requested notice within three days of the District's learning of any gender identity issues concerning her child. (ECF No. 31, p. 5; ECF No. 5-2, p. 2). She also had a meeting with District personnel, making the same requests, only to be told that "under no circumstances" would she be notified if the District "becomes aware that her child has requested to be addressed by different pronouns, a different name, or otherwise exhibited behavior consistent with gender incongruity, gender dysphoria, or a desire to transition to a gender other than her biological gender" unless "legally required to do so." (*Id.*).

Dr. Brian Miller, the District's Superintendent, avers that "[Doe's] child has not sought support under [AR] 103(B). [Doe's] child has not approached any employee, staff member, or administrator for support, guidance, or in search of any benefit provided by [AR] 103(B)." (ECF No. 17-1, p. 3). The only interaction between Doe's child and the school counselor has been routine and involved class scheduling. (*Id.*). Beyond Doe and her child, Dr. Miller states that "[a]fter a thorough investigation, I can confirm that a parent/guardian for all students of the Pine-Richland School District supported under [AR] 103(B) is aware of, and involved in, its implementation." (*Id.* at 2). He also states that "[t]here is no Policy or Administrative

6

Regulation of the Pine-Richland School District that permits, encourages, or recommends a psychological evaluation of a student without parental consent in any circumstance." (*Id.* at 3).

Doe asks the Court to enjoin the District from implementing or enforcing Sections C, D, E, F, G, and H of AR 103(B), claiming that it violates the Fifth and Fourteenth Amendments (Count I), the provisions of 20 U.S.C. § 1232(h) (Count II), the common law right of parental consent (Count III), and the Minors' Consent to Medical Care Act, 35 P.S. § 10101, *et seq.* (Count IV). (ECF Nos. 5 and 31).

### III. ANALYSIS

**A. Doe has not demonstrated that she is likely to succeed on the merits of the claims set forth in the Amended Complaint.**

In order to obtain the requested preliminary injunctive relief, Doe must demonstrate that she "can win on the merits." *Reilly*, 858 F.3d at 179. At this stage, Doe does not have to make "a more-likely-than-not showing of success on the merits." *Id.* at 179 n.3. Instead, she must "show a *likelihood* of success on the merits (that is, a reasonable chance, or probability, of winning)." *Singer Mgmt. Consultants v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc) (emphasis in original). This "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d at 179.

Doe cannot meet her burden of showing a reasonable likelihood of success on the merits because she has not demonstrated an injury-in-fact necessary to confer Article III standing. Absent standing, the Court cannot examine her substantive claims. As the Court stated in the introduction to this memorandum opinion, the Constitution only gives it the authority to decide actual cases and controversies. "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes. Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative

and Executive Branches, or of private entities. And federal courts do not issue advisory opinions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* at 423 (citing *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).

The Supreme Court has explained that to establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Thus, "the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)).

As to the injury-in-fact requirement, the Supreme Court has instructed that to satisfy Article III, the injury must be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly impending*." *Clapper*, 568 U.S. at 409 (emphasis in original) (citation omitted). The Supreme Court has, therefore "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

In determining whether Doe has alleged an injury that is concrete, particularized and actual or imminent, the Court is guided by persuasive cases of other federal courts addressing similar issues to those she presents—i.e., in what circumstances parents have Article III standing to challenge public school gender policies. A number of courts have decided cases that are factually similar to Doe's action. In applying the Supreme Court precedent cited above, those courts have held that for Article III standing to be present, parents must point to something more than the mere concern that a school may apply its transgender policy to their child.

In *John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ. et al.*, 78 F. 4th 622 (4th Cir. 2023), the United States Court of Appeals for the Fourth Circuit held that parent plaintiffs lacked standing to challenge the defendant school district's Guidelines for Gender Identity (dubbed by the plaintiffs as the "Parental Preclusion Policy"). The defendant district promulgated a comprehensive policy "that permit[s] schools to develop gender support plans for students. The [policy] allow[s] implementation of these plans without the knowledge or consent of the students' parents. [It] even authorize[s] the schools to withhold information about the plans from parents if the school deems the parents to be unsupportive." *Id.* at 626. The plaintiff parents alleged that the policy "violates their fundamental right to raise their children under the Fourteenth Amendment of the Constitution as well as various state and federal statutes." *Id.* at 627.

> The Fourth Circuit observed:
>
> The parents have not alleged that their children have gender support plans, are transgender or are even struggling with issues of gender identity. As a result, they have not alleged facts that the Montgomery County public schools have any information about their children that is currently being withheld or that there is a substantial risk information will be withheld in the future.

9

*Id.* at 626. It held that the parents failed to allege an actual or imminent injury required to confer standing under Article III. *Id.* at 629. It explained that "standing requires either a current injury, a certainly impending injury or a substantial risk of future injury. And the parents do not allege one." *Id.* "As for current injury, they have not alleged any of their children have gender support plans. Nor have they alleged that their children have had any discussions with school officials about gender-identity or gender-transition issues." *Id.* The Fourth Circuit further explained that the parents failed to allege a certainly impending future injury: "[f]or example, they have not alleged that they suspect their children might be considering gender transition or have a heightened risk of dosing so … [T]he closest the parents come to alleging such a possibility is stating that '[f]or all [they] know,' their children 'might soon be' subject to a gender support plan that is withheld from them." *Id.* at 630. It held that the parents' claims were based on "a speculative fear, the occurrence of which requires guesswork as to actions of others." *Id.* at 631. The Fourth Circuit explained:

> Determining whether the parents will ever sustain an injury based on the Parental Preclusion Policy requires a chain of the following future events to occur: (1) their minor children must determine they identify as transgender or gender nonconforming, (2) their minor children must decide they want to approach the school about a gender support plan, (3) the school must deem the parents unsupportive and (4) it must then decide to keep the information about their children from them.

*Id.* Finally, it rejected the idea that Article III standing exists because the parents "may never know they have been injured." *Id.* It explained that under firm Supreme Court precedent (*i.e.*, *Clapper*), "we do not toss out the injury requirement because the government hides information." *Id.* The Fourth Circuit concluded, "the fact that the Montgomery County Board of Education permits its schools to keep information about its students' gender support plans and related

gender-identity issues from their parents, while perhaps repugnant as a matter of policy, does not create standing." *Id.*

The United States District Court for the Western District of Wisconsin reached a similar conclusion to the Fourth Circuit's *Montgomery* decision in *Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist.*, 657 F. Supp. 3d 1161 (W.D. Wis. 2023). There, an unincorporated association of parents sued the defendant school district claiming that its internal guidance on the treatment of transgender, non-binary, and gender-nonconforming students violates their federal and state constitutional and statutory rights. The Wisconsin district court held that the parents lacked Article III standing because they failed to allege an actual or imminent injury. In so holding, it explained:

> More critical to the standing analysis, however, is that plaintiff does not allege (1) that any of its members' children are transgender or gender nonconforming, (2) that the district has applied the gender identity support Guidance or Plan with respect to its member's [sic] children or any other children, or (3) that any parent or guardian has been denied information related to their child's identity.

*Id.* at 1169–70. Thus, the district court held that the complaint did not include allegations "supporting an inference that any actual harm is occurring now." *Id.* at 1170. The court also found that there was nothing pled to support a determination that injury was imminent:

> Plaintiff's entire standing argument is premised on a speculative chain of possibilities, including future choices made by individuals who have not yet been identified, indeed, who *cannot* yet be identified because they have *not* acted, and they might *never* act. This will not suffice. "[T]he failure to raise a right to relief above the speculative level is the very definition of insufficient." Plaintiff's asserted injuries are based on its belief that the Guidance one day will interfere with one of its members' right to direct the upbringing of their child. Therefore, to sustain an injury, a member's child must: (1) develop a belief that they have a gender identity that differs from their biological sex; (2) affirmatively approach a district employee and request gender identity support; (3) request a gender support plan; and (4) make the request without parental consent or knowledge. Also part of this chain of possibilities are: (5) the school must not discuss the gender support plan with the parent and/or (6) the parent must not request to see the student's educational records.

11

*Id.* at 1171 (internal citations omitted).

The United States District Court for the Northern District of Iowa, faced with similar claims, reached the same result in *Parents Defending Educ. v. Linn-Mar Cmty. Sch. Dist.*, 629 F. Supp. 3d 891 (N.D. Iowa 2022). An association of parents challenged a comprehensive gender policy that included a privacy policy containing the following: "[t]he district shall not disclose information that may reveal a student's transgender status to others including but not limited to other students, parents, and school staff unless legally required to do so (such as national standardized testing, drivers permits, transcripts, etc.), or unless the student has authorized such disclosure." *Id.* at 900. The parent plaintiffs raised two classes of claims. The first class was that the defendant district's policy violated parental rights. The second class was that the policy included provisions infringing free speech.

The district court held that the parents lacked standing to assert violations of parental rights (although certain speech-related claims were permitted to proceed). Like the cases discussed above, the district court concluded that the parents had not asserted injury in fact or an imminent injury:

> [P]laintiff asserts a conjectural possibility of injury via a Gender Support Plan being created for the children without parental knowledge or consent. They predict the school and/or their children will not involve the parents in the creation of or discussions about a Gender Support Plan and that the school will not be forthcoming about Gender Support Plans when parents ask in violation of their fundamental rights of child-rearing. Based on the record currently before the Court, no one has been denied information related to their child's gender identity or Gender Support Plan. Though the Court does not doubt their genuine fears, the facts currently alleged before the Court do not sufficiently show the parents or their children have been injured or that they face certainly impending injury through enforcement of the Policy. The theory that (1) their child will express a desire for or indicate by mistake a desire for a plan, (2) the child will be given a plan, (3) without parental consent or knowledge, (4) and the information will be hidden or denied when parents ask requires too many speculative assumptions without sufficient factual allegations to support a finding of injury.

*Id.* at 908 (citation omitted).[1]

Finally, the recent decision of the United States District Court for the Southern District of Ohio in *Kaltenbach et al. v. Hilliard City Sch.*, No. 2:23-cv-187, 2024 WL 1831079 (S.D. OH Apr. 19, 2024), is an instructive illustration of circumstances where parents do, and do not, have standing to challenge a school's gender policy. The policy at issue was described as follows:

> The District's "default" is that it will tell parents anything important about their children, including things related to LGBTQ+ issues. However, there is a "health and safety" exception to this default. Separately, the District labels people who do not support LGBTQ+ youth as "unsafe." Plaintiffs allege that when a parent is labeled "unsafe," the "health and safety" exception applies[,] and, therefore, the parent will not be told important information. Thus, Plaintiffs allege, if a child reports that the child is struggling with LGBTQ+-related issues, and if that child's parent has been labelled "unsafe," that parent will never be informed about the child's struggles.

*Id.* at *1 (internal citations omitted).

The district court held that one parent had standing to challenge the defendant district's policy. The parent had a child who was subjected to the defendant district's policy without parental knowledge and who was referred to by a different name and pronouns at school (again, without parental knowledge). The parent only became aware of the school's interaction with her child after the child was hospitalized due to a suicide attempt. This parent had Article III standing to challenge the defendant district's policy.[2]

The Court held that the other parent plaintiffs (whom it referred to as "In-District Plaintiffs") lacked standing:

---

[1] The United States Court of Appeals for the Eighth Circuit vacated the district court's opinion on other grounds. The claims relating to parental rights had become moot while the case was on appeal. *Parents Defending Educ. v. Linn-Mar Comty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023).

[2] The district court held that the parent only had standing to seek damages from the school district. She did not have Article III standing to seek any prospective relief with respect to the district's policy because the child no longer attended a school in the district and, therefore, was no longer subjected to the district's policies. *Id.* at *5.

> In-District Plaintiffs' theory for the Claims is as follows: if the District believes a parent does not support LGBTQ+ youth, the District labels that parent as "unsafe." If an "unsafe" parent's child expresses or questions an LGBTQ+ identity (or makes statements suggesting a mental illness), the District may decide that the fact that the parents [are] "unsafe" warrants a "health and safety" exception to the default policy of telling parents important things about their children. If that happens, the District may offer the child mental health treatment without consulting the parents. These actions, allege In-District Plaintiffs, would violate their rights to freedom of conscience, familial integrity, and freedom of speech. Further, because the District allegedly does all these things under impermissibly vague Policies, the District violates the parents' due process rights.
>
> In other words, *if* a child expresses or questions an LGBTQ+ identity (or shows signs of a mental illness) to a school official, and *if* the parent has, or is perceived to have, anti-LGBTQ+ views, and *if* the school knows about those views, and *if* the combination of those facts mean the school does not tell the parent about the child's sexual-identity comments, and *if* the school gives the child mental health treatment without the parent's consent or knowledge, *then* the parent's rights are violated because the parent is being "punished" for his or her beliefs and speech, is deprived of the ability to make important health decisions for the child, and has suffered these deprivations under impermissibly vague Policies.
>
> The number of "ifs" in the preceding paragraph show[s] why In-District Plaintiffs lack standing. In-District Plaintiffs offer no allegations that their children have told or will tell the school that they are (or may be) LGBTQ+ or that the children show any signs of mental illness. Because In-District Plaintiffs have not plausibly alleged that their children have reported or will report such issues to school officials, they have likewise not plausibly alleged that they will suffer any injury as a result of what the District might do in response to such a report.

*Id.* at *3 (internal citation omitted) (emphasis in original).

Many of the considerations that led to the determination that the plaintiffs in the above-referenced cases lacked Article III standing are present in this case. The sum of Doe's allegations relating to standing are that she is a parent of a child in the District, that there are members of her child's friend group who may identify as transgender, and that she believes her child has visited websites addressing transgender issues. She has not alleged that her child identifies as transgender, that her child has approached the District with respect to gender, or that the District has interacted with her child in any way with respect to gender. Further, Doe agreed

14

to proceed on her pleadings without adducing any further evidence in support of her claims and without cross-examining the facts presented by Dr. Miller—who declares that Doe's child has never approached District personnel with respect to gender issues and that the only interaction that the District has had with Doe's child concerns normal school related issues, such as class scheduling. (ECF No. 17-1, p. 3).

Doe has not pled or presented evidence of a current injury or an imminent future injury. Rather, like the plaintiffs in the cases discussed above, she has presented concerns that an injury *may* arise but nothing to show that that injury is "certainly impending" or that there is a "substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (emphasis added). The unimpeached facts of record (per Dr. Miller's Declaration) are that the District has not applied its gender policy to Doe's child. It has never been approached by, or otherwise interacted with, Doe's child with respect to gender. These facts cannot support a finding of a current injury. Nor can they support a finding of imminent injury. The mere fact that Doe's child has friends who identify as transgender and that the child allegedly looked at internet sites discussing gender issues does not indicate that Doe's child identifies as transgender. Even if the child did, standing still does not exist unless Doe's child has some interaction with the District pursuant to its gender policy. But Doe has failed to submit anything to establish a nexus between her child and the District's gender policy. At this point, a finding of imminent injury to Doe "requires too many speculative assumptions without sufficient factual allegations to support a finding of injury." *Linn-Mar*, 629 F. Supp. 3d at 908. Nor, as the Supreme Court instructed in *Clapper*, do Doe's concerns that she may not know about interactions between her child and the District confer standing.

Because Doe has not met her burden of establishing standing under Article III, the Court cannot address the substance of her claims. As such, for the purposes of the requested preliminary injunction, the Court holds that Doe has not shown a reasonable likelihood of success on the merits.

### B. Doe has not shown that she will suffer irreparable harm absent the Court granting her requested preliminary injunction.

The next prong of the test for whether a preliminary injunction may issue asks whether Doe has established that she "is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179. In other words, Doe must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno*, 40 F.3d at 653 (citation omitted). This potential harm must be "immediate"—it is insufficient to warrant preliminary injunctive relief "if the harm will occur only in the indefinite future." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (citation omitted).

Doe fails under this prong for the same reasons discussed above. She has not demonstrated that she will suffer irreparable harm absent the grant of a preliminary injunction. Doe has not demonstrated any actual or immediate harm. Absent the harm required to confer Article III standing, the type of injury that would support a preliminary injunction does not exist.

If a movant cannot establish the first two prongs—the "gateway factors"—for preliminary injunctive relief, the Court does not have to weigh the remaining issues, and a preliminary injunction may not issue. The Court need not, therefore, conduct an analysis of the remaining prongs.

### IV. CONCLUSION

There is no question that the issues presented by Doe are important and timely. There is no question that Doe's concerns about the District's policies are legitimate. Nevertheless, even

16

where a case presents important and timely issues, "[f]ederal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion*, 594 U.S. at 423. The Constitution only confers jurisdiction over cases and controversies in which a plaintiff has standing. Because Doe cannot demonstrate that she has incurred an injury, or that an injury is impending, she lacks the standing necessary to permit the Court to examine the merits of her claims. The Court must, therefore, deny her motion. An Order of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

_5/7/24_____
Date