**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JANE DOE, JOHN ROE, and JANE ROE,<br><br>Plaintiffs,<br><br>v.<br><br>PINE-RICHLAND SCHOOL DISTRICT,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | No. 2:24-cv-00051-WSS<br><br>**JURY TRIAL DEMANDED** |

**THIRD AMENDED COMPLAINT**

Plaintiffs Jane Doe, John Roe, and Jane Roe file this third amended complaint and aver as follows.

**Parties, jurisdiction, and venue**

1. Plaintiff Jane Doe ("Doe") is a parent who resides within the Pine-Richland School District, and a citizen of the Commonwealth of Pennsylvania.

2. Plaintiffs John Roe and Jane Roe (together, the "Roes") are husband and wife and parents in the Pine-Richland School District, and citizens of the Commonwealth of Pennsylvania.

3. The Roes are the parents of several minor children who are currently enrolled as students in the Pine-Richland School District.

4. Doe and the Roes (together, "Plaintiffs") proceed under pseudonyms to protect the privacy and safety of their minor children, given the highly personal and sensitive nature of the matters at issue in this case.

5. Defendant Pine-Richland School District (the "School District") is a school district organized under Pennsylvania law.

6. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 42 U.S.C. § 1983.

7. Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district. 28 U.S.C. § 1391(b)(2).

## FACTS

### A. Administrative Regulation 103(B)

8. This case concerns the constitutionality of School District Administrative Regulation 103(B) ("AR 103(B)") under the First, Fifth, and Fourteenth Amendments to the United States Constitution. A copy of AR 103(B) is attached at Exhibit "1."

9. AR 103(B) is an official policy, custom, edict, and practice of the School District.

10. As AR 103(B) expressly states, "the purpose of this administrative regulation is to provide additional information and direction about gender and gender identity." *Id.*

11. AR 103(B) states that "**[a]ll** students" -- regardless of age -- "have a right to privacy and this right includes the right to keep one's transgender status **private** at school." *Id.* (emphasis added).

12. According to AR 103(B) disclosing a student's "transgender status" to the student's "parents/guardians . . . may also violate privacy laws, such as the Family Educational Rights and Privacy Act (FERPA)."

13. AR 103(B) states, "transgender and gender-expansive students have the right to discuss his or her gender identity openly and to decide when, with whom, and how much to share private information." *Id.*

14. AR 103(B) states, "[t]o ensure the safety and well-being of the student, District personnel should not disclose a student's transgender status to others, including the student's parents/guardians or other District personnel, unless: (1) legally required to do so, or (2) the student has authorized such disclosure." *Id.*

15. AR 103(B) prohibits School District personnel from disclosing a student's transgender status to the student's parents or guardians. *Id.*

16. AR 103(B) directs the building principal or staff member designee to "privately ask transgender or gender-expansive students . . . how they want to be addressed . . . in correspondence to the home, or at conferences with the student's parent/guardians." *Id.*

17. This effectively requires school personnel, at the request of a student, to use certain pronouns or names with the student at school, but a different name and different pronouns with parents at school or in correspondence sent home.

18. The School District believes that "notifying a student's parent/guardian about his or her gender identity or transition may be unnecessary." *Id.*

19. And "in some cases, informing parents/guardians about a student disclosure carries risk for the student, such as physical and/or emotional abuse, abandonment, and/or removal from the home." *Id.*

20. But AR 103(B) goes further than requiring that School District personnel keep critical details about a child's health, welfare, and upbringing secret from parents or guardians.

21. AR 103(B) also requires that the School District engage in a secret psychological evaluation of the student, including students as young as 5, conducted by government psychologists, who assist the child with a plan for transitioning to a new gender.

22. This psychological evaluation of the student and transition plan takes place without any involvement of the student's parents whatsoever.

23. AR 103(B) states the School District shall provide a Student Support Team a/k/a Gender Transition Team to the student who will "discuss a timeline for the transition in order to create the conditions supporting a safe and accepting environment at the school." *Id.*

24. The School District's Gender Transition Teams work to assist any student, including students in kindergarten, in his or her transition without any involvement of the student's parents or guardians and without even notifying the parents at all.

25. Furthermore, AR 103(B) requires the School District, at the direction of the student, to:

a. Address the student by his or her preferred pronouns;

b. Use the student's preferred name, gender, and pronouns on "school records or documents, such as school IDs, classroom rosters or the yearbook;"

c. Permit the student to use whatever bathroom that the student chooses; and

d. To participate on the sports team corresponding with the student's chosen gender.

26. Finally, AR 103(B) requires all School District personnel to undergo "training" provided by a psychologist and a legal team to ensure compliance with AR 103(B).

27. AR 103(B) contains no provision permitting a parent to receive notice of, or to opt his or her child out of, any of the measures described above, and it contains no exemption for parents who object to those measures on religious grounds.

**B. Doe's Request for Notifications.**

28. For the 2023-24 school year, Doe's child was enrolled as a student in the School District.

29. While her child was enrolled, Doe sent written notice to the School District that, absent her prior written consent, the School District shall not refer her child to any mental health counselor or social worker for evaluation.

30. Doe's notice to the School District also demanded that the School District notify her within three days of learning about any matters related to gender identity or gender dysphoria expressed by her child.

31. Doe met the principal of her child's school and the school's guidance counselor, to discuss her written notice.

32. At the meeting, School District representatives told Doe that, pursuant to AR 103(B), under no circumstances would the School District notify her if it becomes aware that her child has requested to be addressed by different pronouns, a different name, or other exhibited behavior consistent with gender dysphoria or a desire to transition to a gender other than her biological gender.

33. The School District's representatives further stated to Doe that they would only notify her if "legally required to do so."

34. Finally, the School District's representatives stated to Doe that she had no parental rights under AR 103(B).

35. Thereafter, Doe emailed the School District memorializing what was stated to her at the meeting, including the statements made concerning AR 103(B), and demanding that the School District immediately notify her if she had misstated the School District's positions concerning AR 103(B).

36. The School District responded to Doe's email.

37. Regarding AR 103(B), the School District stated the School District was a "partner" with parents and, therefore, would not comply with Doe's demand to be notified if the School District becomes aware that her child has requested to be

addressed by different pronouns, a different name, or other exhibited behavior consistent with gender dysphoria or a desire to transition to a gender other than her biological gender.

38. Rather, the School District stated it would work with the student, not the parent, on such matters.

39. Doe has legitimate concerns regarding her child's risk of transitioning.

40. Doe found her child viewing TikTok videos related to transitioning, videos of transgender individuals advocating transitioning, and videos on sexuality.

41. Doe's child has recently begun hanging out with a new friend group, which includes children who identify as transgender or who are socially transitioning.

42. The years during and after COVID were very difficult for Doe's child at school. It raised social and emotional challenges that affected and were difficult for Doe's child to manage.

43. Doe had concerns that if her child did begin exhibiting signs of gender confusion or gender dysphoria, the School District would immediately begin affirming her before Doe knows and can take steps to help her child obtain appropriate medical care.

44. On or about July 30, 2024, Doe withdrew her child from the School District and enrolled her in a parochial school.

45. Doe's child has attended a parochial school since the 2024-25 school year and continues to attend a parochial school for the 2026-27 school year.

46. Doe withdrew her child from the School District because of AR 103(B).

47. Doe would consider re-enrolling her child in the School District if AR 103(B) is repealed, declared unconstitutional, or enjoined.

**C. The Roes and Their Religious Beliefs.**

48. The Roes are devout Christians.

49. The Roes read Scripture regularly. They believe that the Bible is the inspired Word of God, and they are guided by Scripture in every aspect of their lives, including in how they raise their children.

50. The Roes believe that they have a sacred obligation and a God-given responsibility to raise their children in the Christian faith and in a manner consistent with their religious beliefs and practices.

51. The Roes instill Christian values in their children. They teach their children about human nature, marriage, gender, sexuality, morality, politics, and social issues in accordance with their Christian faith, and they seek to influence how their children think about each of those subjects in accordance with that faith.

52. For the Roes, the religious education of their children is not merely a preferred practice; it is a religious obligation and one of the most important religious acts they perform.

53. Consistent with Scripture, the Roes believe that God created mankind male and female, *see Genesis* 1:27, and that a person's biological sex is a gift from God that is both unchanging and integral to that person's being.

54. The Roes believe that gender cannot be separated from biological sex, and that a person cannot choose a gender identity that is different from his or her biological sex.

55. The Roes believe that marriage is the lifelong union of one man and one woman, and that sexuality is to be expressed only within that union.

56. The Roes believe that children should be helped to accept their own bodies as God created them, and that affirming or facilitating a child's effort to live as, or to be treated as, the opposite sex is contrary to God's design and is harmful to the child.

57. The Roes believe that Scripture commands them to speak the truth and not to bear false witness. For that reason, the Roes do not believe that they can affirm, state, or assent to ideas and concepts that are not true.

58. That includes the false idea and concept that an individual can choose a gender identity that is different from his or her biological sex. The Roes cannot, consistent with their faith, affirm that idea, state it, or participate in conduct that treats it as true, including by referring to their children by names or pronouns inconsistent with their children's biological sex.

59. The Roes believe that if one of their children were to experience confusion about his or her sex or gender, their faith obligates them to be the ones who guide that child: to respond with love, prayer, and Scriptural counsel, and to obtain care for the child that is consistent with their religious beliefs.

60. The Roes' children attend different schools in the School District.

61. The Roes believe that children are highly impressionable and are likely to accept without question the moral messages conveyed to them by teachers, counselors, and other adults in positions of authority at school.

62. The Roes are concerned that the School District, through adults their children trust, will teach, affirm, and act upon principles about sex and gender identity that directly conflict with the religious beliefs the Roes seek to instill in their children, and that it will do so in secret.

**D. AR 103(B) Burdens the Roes' Religious Exercise.**

63. AR 103(B) applies to the Roes' children, and to the Roes as the parents of children enrolled in the School District. The Roes are objects of AR 103(B).

64. Under AR 103(B), if one of the Roes' children asks to be addressed by a name or pronouns inconsistent with his or her biological sex, or otherwise expresses a gender identity different from his or her biological sex, the School District will, without notifying the Roes and without their consent: (i) address the child by the child's preferred name and pronouns; (ii) change the child's name, gender, and pronouns on school records and documents; (iii) permit the child to use the bathroom and participate on the sports team of the child's choosing; (iv) convene a Student Support Team a/k/a Gender Transition Team to develop a "timeline for the transition"; and (v) direct School District personnel to keep all of this secret from the Roes.

65. AR 103(B) further contemplates that the School District will use one name and set of pronouns for the child at school and a different name and set of

pronouns in correspondence to the Roes' home and in conferences with the Roes, so that the Roes will not learn what the School District is doing.

66. In each of these ways, AR 103(B) requires the School District, acting through teachers, counselors, and administrators whom the Roes' children trust, to affirm to the Roes' children the very proposition that the Roes' faith teaches is false: that a person can choose a gender identity different from his or her biological sex.

67. AR 103(B) does not merely expose the Roes' children to ideas with which the Roes disagree. It directs the School District to actively facilitate a child's social transition to a different gender, and to do so behind the backs of the child's parents.

68. AR 103(B) thereby places the Roes' children in an environment that is hostile to the Roes' religious beliefs and exerts upon those children a psychological pressure to conform to a viewpoint about sex and gender that is contrary to the Roes' faith.

69. By keeping its actions secret from the Roes, AR 103(B) also deprives the Roes of the knowledge they need to fulfill their religious obligation to guide their children, with love, prayer, and Scriptural counsel, at the very time that guidance matters most.

70. Under AR 103(B), whether the Roes are ever told, and the degree to which they will be permitted to participate at all, is left to the School District. AR 103(B) directs School District staff, "[p]rior to notification of any parent/guardian regarding the transition process," to "assess the degree to which, if any, the

parent/guardian will be involved with the process," and it describes parental notification as carrying risk of "physical and/or emotional abuse."

71. The parents most likely to be deemed a "risk" and excluded under that assessment are parents, like the Roes, whose sincere religious beliefs do not permit them to affirm that their child can change his or her gender. AR 103(B) thus treats sincere religious belief about sex and gender as a potential source of harm to children.

72. And if the Roes were "involved" in the process, AR 103(B) contemplates that they would participate in a Student Support Team meeting and transition "timeline" premised on affirming the child's asserted gender identity, which the Roes cannot do consistent with their faith.

73. AR 103(B) confers on School District personnel broad discretion to decide, family by family and case by case, whether and to what extent parents will be informed of and involved in their child's gender transition, based on the School District's own evaluation of the family, including the parents' beliefs.

74. AR 103(B) provides the Roes no notice, no opportunity to opt their children out, and no religious exemption.

75. Pennsylvania law requires the Roes to send their children to school. 24 P.S. § 13-1327.

76. AR 103(B) therefore forces the Roes to choose between exercising their religion by raising their children in accordance with their faith and receiving the free public education to which their children are entitled.

77. The threatened injury to the Roes is certainly impending, and there is a substantial risk that it will occur. The School District has adopted AR 103(B) as official policy, has trained its personnel to comply with it, and has stated that it will apply it without exception.

78. The Roes need not wait until the School District has secretly begun to transition one of their children before seeking relief. By the nature of AR 103(B), the Roes may never learn that it has been applied to their children.

79. AR 103(B) is causing, and will continue to cause, the Roes irreparable harm.

**COUNT ONE**
**Violation of the Free Exercise Clause of the First Amendment, as Applied to the States Through the Fourteenth Amendment**
**(42 U.S.C. § 1983)**

80. Plaintiffs incorporate the previous paragraphs by reference.

81. The First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. The Free Exercise Clause applies to the States and their political subdivisions, including the School District, through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

82. "Government schools, like all government institutions, may not place unconstitutional burdens on religious exercise." *Mahmoud v. Taylor*, 606 U.S. 522, slip op. at 17 (2025).

83. The Supreme Court has "long recognized the rights of parents to direct 'the religious upbringing' of their children." *Id.* (quoting *Espinoza v. Montana Dept.*

*of Revenue*, 591 U.S. 464, 486 (2020)). Those rights are violated by government policies that "substantially interfer[e] with the religious development" of children. *Id.* (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)).

84. "[F]or many Christians, Jews, Muslims, and others, the religious education of children is not merely a preferred practice but rather a religious obligation." *Mahmoud*, slip op. at 18. The Roes are among them.

85. The right of parents "to direct the religious upbringing of their" children "would be an empty promise if it did not follow those children into the public school classroom." *Id.*, slip op. at 19.

86. When a school policy imposes a burden of the same character as the burden in *Yoder* —one that "substantially interfer[es] with the religious development" of a child or poses "a very real threat of undermining" the religious beliefs and practices a parent wishes to instill—strict scrutiny applies regardless of whether the policy is neutral and generally applicable. *Id.*, slip op. at 36–37.

87. The Supreme Court has held that a school policy that conceals a child's gender transition at school from the child's parents and requires schools to use a child's preferred names and pronouns likely triggers strict scrutiny because it "substantially interfere[s] with the 'right of parents to guide the religious development of their children.'" *Mirabelli v. Bonta*, 607 U.S. ___, No. 25A810, slip op. at 4–5 (Mar. 2, 2026) (per curiam) (quoting *Mahmoud*, 606 U.S. at 559).

88. As the Supreme Court explained, "the intrusion on parents' free exercise rights here—unconsented facilitation of a child's gender transition—is greater than

the introduction of LGBTQ storybooks we considered sufficient to trigger strict scrutiny in *Mahmoud*." *Id.*, slip op. at 5.

89. The Roes hold sincere religious beliefs about human nature, sex, gender, marriage, and sexuality, and they have a religious obligation to raise their children in accordance with those beliefs.

90. AR 103(B) substantially interferes with the religious development of the Roes' children and poses a very real threat of undermining the religious beliefs and practices the Roes wish to instill in them. Among other things, AR 103(B):

a. requires the School District, through adults the Roes' children trust, to affirm and facilitate a child's gender transition, thereby teaching the child, by word and by conduct, the very proposition that the Roes' faith holds to be false;

b. requires the School District to keep a child's gender transition secret from the Roes, depriving them of the ability to fulfill their religious obligation to guide their children at the time that guidance matters most;

c. requires the School District to use different names and pronouns for a child at school and with the child's parents, so that the Roes will be misled about their own child;

d. conditions the Roes' involvement, if any, on the School District's assessment of whether the Roes' beliefs pose a "risk" to their own

child, and on the Roes' participation in a transition process that would require them to affirm what they believe to be untrue; and

e. provides the Roes no notice, no opportunity to opt out, and no religious exemption.

91. AR 103(B) thus imposes on the Roes a burden of the same character as the burden in *Yoder* and *Mahmoud*, and a greater burden than the one at issue in *Mahmoud*. Strict scrutiny applies.

92. Independently, strict scrutiny applies because AR 103(B) is neither neutral nor generally applicable.

93. AR 103(B) is not neutral because it treats fit parents who hold traditional religious beliefs about sex and gender as a presumptive source of "physical and/or emotional abuse" and makes their exclusion from their children's lives more likely precisely because of those beliefs. The Free Exercise Clause bars even "subtle departures from neutrality." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 638 (2018) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 (1993)).

94. AR 103(B) is not generally applicable because it vests School District personnel with discretion to decide, case by case, whether, when, and to what degree parents will be informed of and involved in their own child's gender transition, based on the School District's individualized assessment of the family. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021).

95. To survive strict scrutiny, the School District must show that AR 103(B) "advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Mahmoud*, slip op. at 37 (quoting *Fulton*, 593 U.S. at 541).

96. AR 103(B) cannot satisfy strict scrutiny because the School District has no compelling interest in concealing from fit parents, like the Roes, that their child is undergoing a gender transition at school. Policies like AR 103(B) "cut out the primary protectors of children's best interests: their parents." *Mirabelli*, slip op. at 5.

97. AR 103(B) is not narrowly tailored because any legitimate interest the School District has in student safety "could be served by a policy that allows religious exemptions while precluding gender-identity disclosure to parents who would engage in abuse." *Id.* The School District may also protect children from potentially unfit parents by reporting suspected abuse under the Child Protective Services Law, 23 Pa.C.S. § 6301 *et seq.*

98. Nor is the School District's burden on the Roes' religious exercise excused because the Roes could send their children elsewhere. "It is both insulting and legally unsound to tell parents that they must abstain from public education in order to raise their children in their religious faiths." *Mahmoud*, slip op. at 34.

99. The School District adopted and enforces AR 103(B) as its official policy, under color of state law, and is therefore liable under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

100. AR 103(B), on its face and as applied to the Roes, violates the Free Exercise Clause of the First Amendment, as applied to the States through the Fourteenth Amendment.

101. The Roes have no adequate remedy at law. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam).

**COUNT TWO**
**Violation of the Due Process Clause of the Fourteenth Amendment**
**Parental Right to Direct the Religious Upbringing, Education, and Care of Their Children**
**(42 U.S.C. § 1983)**

102. Plaintiffs incorporate the previous paragraphs by reference.

103. The Due Process Clause of the Fourteenth Amendment protects "the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925); *accord Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923).

104. "The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce*, 268 U.S. at 535.

105. "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Yoder*, 406 U.S. at 232. That role expressly includes "the religious upbringing" of children. *Id.* at 213–14, 232–33.

106. "[P]arents, not schools, have the primary responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005).

107. The parental right protected by the Fourteenth Amendment "includes the right not to be shut out of participation in decisions regarding their children's mental health." *Mirabelli*, slip op. at 5 (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979)).

108. The Supreme Court has held that policies which conceal from parents a child's symptoms of gender dysphoria at school and "facilitate a degree of gender transitioning during school hours" likely violate "parents' rights to direct the upbringing and education of their children." *Id.*, slip op. at 6.

109. AR 103(B) violates the Roes' fundamental right to direct the religious upbringing, education, and care of their children by, among other things: (i) concealing from the Roes any expression by their children of a gender identity inconsistent with their biological sex; (ii) facilitating a social transition of their children to a different gender without the Roes' knowledge or consent; (iii) subjecting their children to a Student Support Team a/k/a Gender Transition Team, and to evaluation and planning regarding their gender identity, without the Roes' knowledge or consent; (iv) misleading the Roes, through the use of different names and pronouns at home and at school, about their own children; and (v) substituting the School District's judgment for the Roes' judgment on matters of religion, morality, and mental health that are committed to parents.

110. The Roes' Fourteenth Amendment claim is reinforced by their Free Exercise claim. Where, as here, the parental right to direct the upbringing of one's children is asserted in conjunction with the right to the free exercise of religion, government action that burdens those rights is subject to strict scrutiny. *See Yoder*, 406 U.S. at 233–34; *Employment Div. v. Smith*, 494 U.S. 872, 881 & n.1 (1990).

111. AR 103(B) infringes a fundamental right and is therefore subject to strict scrutiny, which, for the reasons set forth above, it cannot satisfy.

112. The School District adopted and enforces AR 103(B) as its official policy, under color of state law, and is therefore liable under 42 U.S.C. § 1983.

113. AR 103(B) is causing, and will continue to cause, the Roes irreparable harm for which they have no adequate remedy at law.

**COUNT THREE**
**Violation of the Fifth and Fourteenth Amendments**
**Substantive Due Process**

114. Doe incorporates the previous paragraphs by reference.

115. Under the Fourteenth Amendment, Doe has a fundamental liberty interest in making child-rearing decisions. *Tatel v. Mt. Lebanon Sch. Dist.*, 2022 WL 15523185, at *11 (W.D. Pa. Oct. 27, 2022) ("The parental right to custody, control and nurture of their children is deeply rooted and implicit in the United States' concept of ordered liberty.")

116. "The right of parents to raise their children without undue state interference is well established." *Gruenke v. Seip*, 225 F.3d 290, 303 (3d Cir. 2000)

117. Indeed, the right to make decisions concerning the care, custody, and control of one's children "is perhaps the oldest fundamental liberty interest recognized." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

118. This includes the "fundamental constitutional right to right to control the inculcation of values in their children," *Tatel* 2022 WL 15523185 at *23, and to make educational choices. *Troxel*, 530 U.S. at 65.

119. The Third Circuit recognizes that through this liberty interest, "parents, not schools, have the primary responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship." *C.N. v. Ridgewood Board of Education*, 430 F.3d 159, 185 (3d. Cir. 2005).

120. The Third Circuit further recognizes that "School-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution." *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000)

121. AR 103(B) violated Doe's fundamental liberty interest to make decisions concerning the care, custody, and control of her child.

122. AR 103(B) violated Doe's fundamental liberty interest by, among other things, (i) failing to provide parents with notification regarding the mental health and well-being of their children, including the life-altering decision to change one's gender, (ii) secretly submitting children to psychological and mental evaluations by government psychologists and officials, (iii) secretly subjecting children to

interrogation by a team of government officials about their parents religious and political beliefs regarding, among other things, gender dysphoria and (iv) secretly providing medical and psychological care by government approved psychologists and medical professionals to a child to "assist" a child in making the life-altering decision to change one's gender.

123. Defendant has acted with reckless disregard for Doe's fundamental parental rights guaranteed under the Fourteenth Amendment.

124. Defendant knowingly deprived Doe of her right under the Fourteenth Amendment to make significant medical, psychological, permanent, and life-altering decisions concerning her child.

125. AR 103(B) has caused Doe irreparable harm.

**COUNT FOUR**
**Violation of Statutory Rights under 20 U.S.C. § 1232h**

126. Plaintiffs incorporate the previous paragraphs by reference.

127. Under 20 U.S.C. § 1232h, without the prior written consent of a parent, the School District shall not submit any student to any analysis or evaluation that reveals information concerning, among other things, (a) the political affiliations or beliefs of the student or the student's parents, (b) mental or psychological problems of the student or student's family, (c) sexual behavior or attitudes, (d) critical appraisals of other individuals with whom the student has a close family relationship, and (e) religious practices or beliefs of the student or student's parents.

128. 20 U.S.C. § 1232h confers an individual right on parents to control whether their child will be subject to such evaluations and examinations by requiring the School District to obtain express written consent from a parent before performing them.

129. AR 103(B) violated Doe's and Roes' rights under 20 U.S.C. § 1232h.

130. AR 103(B) requires that, before notifying a student's parent or guardian of a student's desire to transition genders, the School District to evaluate and analyze a student to determine whether the student's "health, wellbeing, and safety" will be harmed if the student's parent is notified.

131. In performing that analysis and evaluation, the School District will inquire into a parent's religious and political beliefs concerning, among other things, gender dysphoria, gender transitioning, and sexuality.

132. In performing that analysis and evaluation, the School District will inquire as to the student's sexual behavior and attitudes.

133. Under AR 103(B), the School District will perform this analysis and evaluation without first obtaining the express written consent of a parent, like Doe.

134. 42 U.S.C.A § 1983 permits Doe to bring suit for the deprivation of rights or privileges conferred under the laws of the United States.

135. The School District deprived Doe of her rights under 20 U.S.C. § 1232h, which is a law of the United States.

**COUNT FIVE**
**Violation of Common Law Right of Parental Consent**

136. Plaintiffs incorporate the previous paragraphs by reference.

137. Pennsylvania recognizes a common law right that parental consent must be secured before medical treatment is provided. *Parents United for Better Sch., Inc. v. Sch. Dist. of Philadelphia Bd. of Educ.*, 646 A.2d 689, 691 (Pa. Cmwlth. 1994) ("The principle that parental consent must be secured before medical treatment provided is time honored and has been recognized by both the courts and the legislature.")

138. AR 103(B) states that it will provide medical treatment to children without having to secure prior parental consent.

139. The School District told Doe it would not secure her consent before providing gender affirming or gender incongruent care to her child.

140. The School District stated to Doe that she has no rights as a parent.

141. Doe's interests were directly harmed by AR 103(B) and the School District's application of AR 103(B).

142. Doe has been harmed by the School District's breach of her common law parental rights.

**COUNT SIX**
**Violation of the Minors' Consent to Medical Care Act,**
**35 P.S. § 10101, et. seq.**

143. Plaintiffs incorporate the previous paragraphs by reference.

144. Under the Minors' Consent to Medical Care Act, parental consent is required before medical treatment is provided to a minor under 18 years of age. 35 P.S. §§ 10101-10105.

145. AR 103(B) violates the Minors' Consent to Medical Care Act because it permits the School District to provide medical and mental health care without first obtaining the consent of a parent or legal guardian. *See* AR 103(B) at ¶ E ("notifying a student's parent/guardian about his or her gender identity or transition ***may be unnecessary***. . . . ***Prior to notification of any parent/guardian regarding the transition process***, District staff must work closely with the student to assess the degree to which, ***if any***, the parent/guardian will be involved with the process and must consider the health, wellbeing, and safety of the transitioning student. . . When a student transitions during the school year, the Student Support Team shall hold a meeting with the student and parents/guardians, ***if they are involved***.")

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, Jane Doe, John Roe, and Jane Roe, respectfully request that this Court enter judgment in their favor and against the School District and award the following relief:

1. Preliminarily and permanently enjoining the School District, and anyone acting through, with, or on behalf of it, from enforcing AR 103(B) against the Roes and their children;

2. Preliminarily and permanently enjoining the School District, and anyone acting through, with, or on behalf of it, from concealing from the Roes, and

requiring it to notify the Roes promptly, if either of their children asks to be addressed by a name or pronouns inconsistent with his or her biological sex, or otherwise expresses a gender identity inconsistent with his or her biological sex;

3. Preliminarily and permanently enjoining the School District, and anyone acting through, with, or on behalf of it, from referring to the Roes' children by any name or pronouns other than those directed by the Roes, from treating the Roes' children as the opposite sex, and from convening a Student Support Team, Gender Transition Team, transition timeline, or gender support plan for the Roes' children, without the Roes' prior written consent;

4. Preliminarily and permanently enjoining the School District, and anyone acting through, with, or on behalf of it, from misleading the Roes, in correspondence, conferences, or otherwise, about the name, pronouns, or gender presentation their children use at school;

5. Preliminarily and permanently enjoining the School District, and anyone acting through, with, or on behalf of it, from requiring the Roes' children to submit to any analysis, examination, or evaluation described in 20 U.S.C. § 1232h without the Roes' express written authorization;

6. Declaring that the School District violated Doe's rights under the Fourteenth Amendment, 20 U.S.C. § 1232h, and Pennsylvania law;

7. Declaring that AR 103(B), on its face and as applied to the Roes, violates the Free Exercise Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment, and is void, invalid, and unconstitutional;

8. Awarding Plaintiffs compensatory and nominal damages; and

9. Awarding Plaintiffs attorneys' fees and costs under 42 U.S.C. § 1988; and

10. Awarding Plaintiffs all other appropriate and necessary relief.

Respectfully submitted,

*/s/ Walter S. Zimolong*
Walter S. Zimolong, III, Esquire
PA Attorney I.D. 89151
James J. Fitzpatrick, III, Esquire
PA Attorney I.D. 320497
ZIMOLONG LLC
wally@zimolonglaw.com
james@zimolonglaw.com
P. O. Box 552
Villanova, PA 19085
(215) 665-0842

*/s/ Nicholas R. Barry*
Nicholas R. Barry
America First Legal Foundation
Tennessee Bar No. 031963
nicholas.barry@aflegal.org
611 Pennsylvania Ave SE #231
Washington, DC 20003

Randall L. Wenger
Independence Law Center
23 N. Front St.
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org
Pa. Bar No. 86537

*Counsel for Plaintiffs*

Dated: October 29, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JANE DOE, JOHN ROE, and JANE ROE | : | No. 2:24-cv-00051-WSS |
| Plaintiffs | : | |
| v. | : | |
| PINE-RICHLAND SCHOOL DISTRICT | : | |
| Defendant | : | |

**CERTIFICATE OF SERVICE**

I hereby certify the foregoing has been filed electronically and is available for viewing and downloading from the Electronic Case Filing System of the United States District Court for the Western District of Pennsylvania.

Date: October 29, 2026 *<u>/s/ Walter S. Zimolong</u>*